IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANTOINE C. NELSON,

                         Plaintiff,                       OPINION AND ORDER

    v.

                                                 18-cv-238-wmc

CAPT. CHRISTOPHER STEVENS, et al.,

                        Defendants.

In 2017, plaintiff Antoine Nelson was incarcerated at the Green Bay Correctional Institution ("Green Bay"), where officials suspected that he was involved in the smuggling of cocaine, as well as possessing and using it. Following an investigation, Nelson was charged in a conduct report with possession and use of an intoxicant and unauthorized transfer of property. Following a disciplinary hearing, Nelson was punished with 240 days in disciplinary separation. Nelson filed this lawsuit *pro se* under 42 U.S.C. § 1983, claiming that the Green Bay officials involved in investigating his activities leading up to his punishment, the procedures related to the disciplinary hearing, and his subsequent transfer to administrative confinement violated his constitutional rights. Shortly after the court granted him leave to proceed, Nelson retained counsel for himself, who has since been representing him. With the assistance of counsel, Nelson claims that (1) defendants Christopher Stevens, James Elsinger and Scott Eckstein violated his Fourteenth Amendment right to due process; (2) defendant Stevens violated his First Amendment right against retaliation for exercising his constitutional rights; (3) defendants Stevens and Chris Heil violated his First Amendment right against interference with attorney

communications; and (3) defendant Stevens violated his Eighth Amendment right against cruel and unusual punishment.

Now before the court are defendants' motion for summary judgment (dkt. #58), Nelson's motion for partial summary judgment (dkt. #73), and Nelson's motion to strike (dkt. #83).  The motion to strike is properly construed as a late reply brief responding to an evidentiary challenge defendants raised in their summary judgment briefing.  The court has incorporated the arguments raised in that motion into the analysis below.  As for the dispositive motions, even construing all evidence of record in a light most favorable to Nelson, no reasonable trier of fact could find in his favor on any of his claims.  Accordingly, the court will grant defendants' motion, deny Nelson's motion and direct entry of judgment in defendants' favor.

## THRESHOLD ISSUES

There are two evidentiary disputes that the court must resolve before setting out the undisputed facts of record.  The first relates to Magistrate Judge Crocker's order granting defendants' request to submit certain evidence under seal.  Judge Crocker allowed defendants to submit a declaration and Exhibits 100 and 105, under seal for *in camera* review only.  (12/19/19 Order (dkt. #54); *see* Exs. 100, 105 (dkt. ##62, 63).)  Since neither his counsel nor he could access the sealed declaration and exhibits, Nelson argues that the court should deny outright defendants' motion under Federal Rule of Civil Procedure 56(d).  Although Rule 56(d)(3) actually allows the court to "make any necessary order," if a nonmoving party shows he or she is unable to present facts essential to support its

opposition, the court would be inclined to agree with Nelson, except that the information submitted under seal from the public record, as well as excluded from Nelson's and his attorney's unredacted view, is not essential to Nelson's opposition.

To begin, when Judge Crocker granted defendants' request to seal those exhibits and submit them for *in camera review* only, he did so to protect the identity of confidential informants. Nelson does not fault Judge Crocker for that decision, and there is no need to revisit it here. Moreover, defendants also submitted redacted versions of those exhibits (*see* Ex. 101, 106 (dkt. ##51-1, 51-2), both of which were available to Nelson and his counsel, and the redacted versions contained much of the information upon which defendants rely in seeking summary judgment. In granting defendants' request for a protected order, Judge Crocker further noted the possibility that the court order those exhibits unsealed if information not available to Nelson became material to the court's resolution of the dispositive motions.

Fortunately, that will be unnecessary here. While defendants do cite to the sealed materials in support of certain proposed findings of fact, they do not rely solely on the sealed evidence, for the most part. More importantly, the court has excluded those materials from consideration in resolving defendants' motion for summary judgment. Accordingly, the court rejects plaintiff's assertion that the court should deny defendants' motion for summary judgment solely because his counsel and he could not access certain redacted portions of Exhibits 101 and 106.

Second, defendants argue that the court should strike one of Nelson's pieces of evidence -- the declaration of non-party prisoner Michael Henderson -- on the ground that

3

it has been fabricated.  (*See* dkt. #76 at 2.)  The fabrication of evidence is a clear and willful abuse of the judicial process, and one courts obviously should and do take seriously.  *See Goodvine v. Vandewalle*, No. 16-cv-890-WCG, 2018 WL 460121 (E.D. Wis. Jan. 17, 2018); *Carter v. Waterman*, No. 13-cv-742-bbc, 2016 WL 407331, at *8-9 (W.D. Wis. Feb. 2, 2016).  So much so that federal courts have the inherent power to sanction a litigant who willfully abuses the judicial process or otherwise conducts litigation in bad faith, *Salmeron v. Enterprise Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009), up to and including dismissal of the lawsuit should plaintiff's false allegations warrant that sanction.  *See Hoskins v.* Dart, 633 F.3d 541, 543 (7th Cir. 2011) (affirming district court's authority to dismiss case when prisoner plaintiff lied about the existence of other lawsuits); *Allen v. Chicago Transit Authority*, 317 F.3d 696, 703 (7th Cir. 2003) ("Perjury committed in the court of legal proceedings is a fraud on the court, and it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case.").

Here, defendants do not seek dismissal of this action, but do ask that the court strike Henderson's declaration from the docket, excluding it from any consideration at summary judgment, because Henderson did not actually sign it.  As proof, defendants submit the declaration from Assistance Attorney General Rebecca Paulson, who compared the signature on Henderson's declaration (*see* dkt. #15) to the signatures Henderson provided in other lawsuits that the Wisconsin Department of Justice has defended (*see* Paulson Decl. Ex. 109 (dkt. #81-1).  In particular, defendants argue that Henderson's signature on his declaration has a distinctive "loopy 'M' which looks nothing like his other signatures."  (Def.' Reply Br. (dkt. #76) at 2.)

4

Nelson did not file a reply brief by the March 16, 2020, deadline, but on April 15, 2020, Nelson did file a motion to strike defendants' request to strike, along with Assistant Attorney General Paulson's declaration.  (Dkt. #83.)  In support, Nelson argues that Paulson is not qualified to authenticate Henderson's signature; she was free to pick and choose the signatures that met her needs; and it is unethical to testify on behalf of her clients.  Nelson also adds that Henderson's statements in his declaration are consistent with the testimony he provided during Nelson's disciplinary hearing.

The court will not strike Henderson's declaration based on defendants' evidence. As an initial matter, like defendants' redacted exhibits, the statements in Henderson's declaration have no material bearing on defendants' motion for summary judgment.  In the end, Henderson acknowledges that he was charged with being involved in the alleged events leading Stevens to charge Nelson in the conduct report, but, like Nelson, Henderson denies any wrongdoing.  Since the court must accept plaintiff's Nelson's first-hand account of those events as true for purposes of summary judgment, Henderson's declaration is cumulative at best.

Having said that, defendants' evidence does raise a legitimate question about whether Henderson actually signed his declaration, which the court takes seriously. Indeed, in reviewing the two sets of signatures, the court notes troubling differences.  As defendants note, the "M" in Henderson's signature in this lawsuit is more loopy than in his signatures from his other lawsuits.  Further, the "H" in Henderson's signature in other lawsuits is pronounced and much larger than in his declaration in this lawsuit, and the letters in his signature in the declaration are more "loopy" as well.  Therefore, there is some

reason to believe that Henderson's signature is not his own.  Still, even assuming that Henderson did not formally sign the affidavit, defendants have offered no other evidence that *Nelson* forged Henderson's signature, nor that Henderson recants any of the statements in his declaration.  Without more, and particularly with no statement from Henderson, the court cannot conclude that it is more likely than not that Henderson's declaration in this lawsuit is not authentic, much less submitted with a fraudulent intent.  Accordingly, the court also rejects defendants' request to strike the declaration and will deny Nelson's motion to strike as moot.  With those issues resolved, the court turns to the material facts.

UNDISPUTED FACTS[1]

**A. Parties**

Plaintiff Antoine Nelson was incarcerated at Green Bay at all times relevant to his claims in this lawsuit.  Defendants were all employed by the DOC and working at Green Bay during the relevant time period; Scott Eckstein was the warden; Christopher Stevens was a Supervising Officer 2 (Captain); Chris Heil was a social worker in Green Bay's Restrictive Housing Unit ("RHU"); and James Elsinger was a Captain.  Nelson was transferred from Green Bay to Waupun Correctional Institution on November 5, 2019.

---

[1] The following facts are material and undisputed, unless otherwise noted.  The court draws the following facts from the parties' proposed findings of fact and responses, along with the cited evidence of record.

## B. Investigation into Nelson Drug-Related Activities

In May 2017, defendant Stevens was named "Investigation Captain," meaning that he conducted most of the investigations into potential illegal activity within the institution. At that time, Captain Stevens received information from a prisoner that Nelson was involved in bringing drugs into Green Bay through his visitors. According to Stevens, the prisoner that sent him the letter included some of Nelson's cocaine in the letter.[2]

Nelson denies bringing drugs into Green Bay. He also purports to dispute that Stevens received such a tip from a prisoner; his position is that Stevens fabricated the tip to justify investigating him. In support, Nelson submits a declaration of a prisoner named Allen Tony Davis, who claims to be the informant. (Allen Tony Davis Decl. (dkt. #14).) Allen Davis says that Stevens caught him with 18 red balloons filled with cocaine on July 9, 2017, and Stevens made a deal with him to make a statement that he could use against Nelson. (*Id.* ¶¶ 3-5.) Further, Allen Davis now specifically recants his previous statement that the cocaine belonged to Nelson. (*Id.* ¶ 8.)

In contrast, defendants assert that in May 2017, rather than in July, Stevens learned Nelson was bringing drugs into Green Bay from a prisoner *other than* Davis. (Stephens Decl. (dkt. #64) ¶ 6; Ex. 101 (dkt. #51-1) 5.)[3] Additionally, Stevens represents that Green

---

[2] Specifically, Stevens says that there was a powdery substance in the letter, which tested positive for cocaine. Stevens further required that prisoner to provide a urine sample. After the sample tested positive for cocaine, that prisoner was also issued a conduct report and punished with time in disciplinary separation status.

[3] Defendants also cite Exhibits 100 and 105 (dkt. ##61, 62) in arriving at these undisputed facts, but as noted, for purposes of summary judgment, the court excluded from consideration any sealed evidence that defendants redacted and would not reveal to plaintiff or his counsel.

Bay staff never found 18 red balloons on Allen Davis; Stevens attests that he was not even working at Green Bay on July 9, 2017. (Stevens Supp. Decl. (dkt. #80) ¶¶ 3-4.) Instead, according to Stevens, staff recovered 18 red balloons of cocaine from the cell of yet another Green Bay prisoner, Michael Henderson, on July 9. Nelson has submitted no evidence suggesting that Stevens was working on July 9.

Regardless of the tip's source, Stevens commenced a large investigation into drug activity at Green Bay, which resulted in several prisoners receiving conduct reports for possession and use of intoxicants, as well as for other rule violations. The investigation included intercepting and reviewing inmate mail for evidence, reviewing letters that Stevens and other staff received about the investigation, interviewing several inmates, reviewing video footage and visiting histories, and conducting urinalyses on several prisoners (who all tested positive for cocaine use).

During his review of prisoner mail, Stevens discovered that large sums of money were being sent by prisoners to individuals having contact visits with Nelson. In particular, Stevens learned that prisoner Jason Rinn wrote a letter to Associated Bank, asking that a cashier's check for $3,300 be sent to Nancy Hanrahan, and that a cashier's check for $3,000 be sent to Brenda Maruri. (Ex. 101 (dkt. #51-1) 1, 5, 13, 19, 21.)[4] Hanrahan was a friend of a prisoner with the last name Hodgkins, and Maruri was one of Nelson's friends. During this time frame, Nelson further acknowledges that he had visits with two friends, Maruri on July 6 and Felicia Davis on July 9, but denies any wrongdoing during either visit.

---

[4] Again, defendants also cite to sealed evidence in Exhibit 100, which the court has not considered for purposes of summary judgment.

On or around July 10, Stevens also spoke with Nelson about his investigation, asking Nelson why Rinn would be sending money to one of his frequent visitors.  Beyond telling Stevens that the money was to pay off a gambling debt, however, Nelson refused to talk.  Nelson then claims that Stevens threatened him.  Nelson further claims that after his conversation with Stevens, he went back to his cell and wrote a letter to Warden Eckstein, explaining that he was afraid of Stevens.

Stevens also interviewed Rinn, who said he was sending Maruri money to buy him a car after his release.  (*See* Ex. 101 (dkt. #51-1) 1.)  Maruri also said that Rinn had asked her to use the money to buy the car.  (Maruri Decl. (dkt. #16).)  Stevens attests that Nelson's and Rinn's inconsistent responses -- and the fact that no one but Nelson mentioned a gambling debt -- was a red flag to him.  (Stevens Decl. (dkt. #64) ¶¶ 10-11.)

Also as a part of the investigation, Stevens ordered urinalyses on all prisoners involved in the transferring of money, which included Rinn and Nelson.  Rinn tested positive for cocaine and was placed in Temporary Lock-up Status pending the investigation.  As for Nelson, non-defendant Officer Debroux instructed him to provide a urine sample on July 12, 2017.[5]  Before Nelson provided a urine sample, however, Stevens saw him in an area of prisoner movement called the Rotunda.  The two had a conversation,

---

[5] Nelson claims that when he asked Debroux *why* his urine would be tested, Debroux responded that he had to submit to the test because he complained to the warden about Stevens, citing to his complaint and the declaration of prisoner Howard Brown.  (Compl. (dkt. #1); Brown Decl. (dkt. #13).)  Defendants object to this proposed finding of fact on hearsay grounds.  Indeed, Debroux is not a defendant to this lawsuit, and Nelson has not argued or submitted evidence suggesting that this statement could fall into one of the hearsay exclusions set forth in Federal Rule of Evidence 801(d)(2).  Accordingly, the court has excluded this statement from its consideration of the parties' pending motions.

during which Nelson maintained that (1) he was not doing drugs and (2) the test was not necessary.  Even so, Nelson ultimately provided a urine sample, which tested positive for cocaine.  His sample was also sent to an offsite lab for a confirmation test, which also tested positive for cocaine.

Nelson maintains that his urinalysis was tainted, and his request for a retest was denied.  In support, Nelson offers a declaration from fellow prisoner Howard Brown, who claims that Stevens said he was going to teach Nelson a lesson when he reported for the urinalysis.  (Howard Brown Decl. (dkt. #13) ¶ 5.)  Brown also says that he saw Stevens go into the testing room, and he heard Stevens tell Nelson that he would show him what "true power" was.  (*Id.*)[6]

Stevens also reviewed surveillance video footage from shortly after Nelson's Sunday, July 9, 2017, visitor with Felicia Davis, which ended at approximately 11:30 a.m.  Shortly after that visit, Stevens claims that he observed on video prisoner Henry Davis receiving a package from Nelson, and then passing that package to prisoner Michael Henderson.  Stevens explains that he made this observation after zooming the camera in two times, but that he was unable to record the footage at that level of focus.  Stevens further explains

---

[6] Notably, Nelson has *not* submitted evidence suggesting that the urinalysis test itself was incorrect, and defendants argue that the court should not consider Brown's statement about what Stevens said to establish a genuine issue of material fact as to whether Stevens doctored Nelson's urinalysis. *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (non-moving party "is entitled to all reasonable inferences in his favor, but inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion").  Although the court accepts that this evidence does not raise a genuine factual dispute as to whether Stevens actually doctored Nelson's urine sample to ensure a positive result for cocaine, Stevens' statements may be relevant to proving his motivation in issuing the conduct report against Nelson.  As such, the will court accept Brown's statements about this interaction, at least for purposes of summary judgment.

that because the footage at the regular level of focus did not show the package exchange, he did not record it.  Finally, Stevens explains that video footage data is only stored on the server for about 10 days, at which point it is written over in the normal course of business. That is apparently what happened to the July 9 footage.

Nelson disputes receiving a package from Henry Davis, and Davis submitted a declaration denying that he received a package from Nelson or passed one to Henderson. (H. Davis Decl. (dkt. #21).)  Nelson further explains that he did not lock back into his cell that day until about 2:30 p.m., because he was doing his job as a "first shift runner," and Henry Davis did not leave his room until after 2:00 p.m.  Henderson likewise submitted a declaration claiming that he never received a package from Henry Davis or Nelson. (Henderson Decl. (dkt. #15).)  Nelson also disputes Stevens' handling of the video footage, claiming that he asked for a copy of the surveillance footage and that Stevens responded it was never recorded.  (Supp. Compl. Ex. 107 (dkt. #12-7).  Nelson adds that another prisoner, Raymond Jackson, heard Stevens threaten Nelson with 15-20 years of time in administrative confinement status if he did not drop the video request.  Stevens says that he subsequently questioned Nelson about why prisoners were testing positive for cocaine. Nelson declined to comment about other inmates, but he continued to insist that he did not do drugs.

Beyond that evidence, Stevens received tips from three other prisoners, who he treated as confidential informants.  Those three prisoners told Stevens that Nelson was responsible for bringing drugs into the prison and that he used visitors to bring the drugs into Green Bay.  Specifically, Stevens noted that they referred to Nelson as "the main

11

person bringing drugs into the Inst[itution]," and he was known as "the man with the coke," who would get balloons during visits and go "back to his cell and throw[] them up." (Stevens Decl. (dkt. #64) ¶¶ 17, 25.)[7]  Nelson disputes that his visitors brought drugs into Green Bay, pointing to declarations from two of his visitors, Maruri and Felicia Davis, who specifically deny ever doing so.  (Maruri Decl. (dkt. #16); F. Davis Decl. (dkt. #17).)

## C. Conduct Report

Following his investigation, Stevens believed that:  (1) Nelson was involved in having visitors bring cocaine into Green Bay; (2) Nelson was using cocaine; and (3) Nelson was passing cocaine along to other prisoners.   On July 18, 2017, therefore, Stevens completed a conduct report, alleging that Nelson violated Wis. Admin. Code § DOC 303.40a "Unauthorized Transfer of Property – Attempts," DOC § 303.43 "Possession of Intoxicants," and DOC § 303.60 "Use of Intoxicants."   Stevens explains that § DOC 303.40a, Unauthorized Transfer of Property, is considered a lesser included offense of § DOC 303.43, Possession of Intoxicants, meaning that a prisoner cannot be found guilty of both offenses.   Stevens believed that Nelson was guilty of possessing cocaine and transferring it to others, but he understood that the hearing officer would be the one to determine whether Nelson was guilty of violating any of the charges.

Stevens cited to the following evidence in support of the violations:

- The $3,000 transferred from Rinn to Nelson's friend, Maruri;

---

[7]  Defendants also cited to redacted portions of Exhibit 101 (*see* Ex. 101 (dkt. #51-1) 52, 59, 62, 75-77), but since Nelson's counsel could not review those pages of Exhibit 101, the court has only considered Stevens' averments about the results of his conversations.

- The fact that Maruri visited Nelson around the time the money was sent;

- The inconsistent explanation for the transfer of this large amount of money;

- Nelson's positive urinalysis;[8]

- Rinn's positive urinalysis; and

- The video evidence.

Stevens denies writing the conduct report out of retaliation for Nelson's refusal to participate in the investigation and points out that he had ample evidence beyond Nelson's statements to complete his investigation regarding drugs coming into the prison. Stevens adds that he decided to write the conduct report due to the serious nature of the offense, and because of the risk to the security of the institution that Nelson created by his involvement in the drug operation. Of course, Nelson disputes these reasons, arguing that Stevens' comments about "teaching him a lesson" and showing him "true power" establish his true intent.

After Stevens wrote up the conduct report, it was assigned number 2843714, and Security Director Kind approved it to proceed. Pursuant to Wis. Admin. Code § 303.78, when a conduct report is served, the prisoner is to be informed of the charges and the contemplated disposition. Based on that information, the prisoner can decide if he wants to accept the contemplated disposition and waive his right to a disciplinary hearing, or he may decline that disposition and proceed to a full disciplinary hearing.

---

[8]  Stevens acknowledges an error in the conduct report related to the urinalysis. He wrote that Nelson provided his urine at "0847" hours on July 12, 2017, but recalls that Nelson actually submitted urine for the test around noon that day.

On July 20, 2017, defendant Elsinger provided Nelson with a copy of Conduct Report 2843714, which outlined the charges listed above.  At that time, Elsinger offered Nelson an uncontested disposition of 240 days of disciplinary separation, asking Nelson whether he wanted to accept that disposition and waive his right to a disciplinary hearing. Elsinger believed that the 240-day disposition was appropriate based on the allegations in the conduct report and seriousness of the offense.   After he declined the proposed disposition, Nelson claims that Elsinger was annoyed and said that he would be the hearing officer to resolve the charges at the hearing, and he intended to impose the 240 days even after a disciplinary hearing because a supervisor had already accepted it.  (Compl. (dkt. #1) ¶ 43.)   Nonetheless, Nelson declined the offer and proceeded to prepare for his disciplinary hearing.

On July 28, 2017, Nelson submitted a form requesting witnesses and evidence for the hearing.  He asked that two prisoners, Michael Henderson and Henry Davis, attend as witnesses.  That request was granted.  Nelson also requested the surveillance video footage Stevens had reviewed, but that request was denied because:  (1) Stevens had not saved the footage; and (2) it had been overwritten by the time Nelson requested it.  It is undisputed that Stevens was involved in denying that request.

### D. Disciplinary Hearing

On July 31, 2017, defendant Elsinger presided over Nelson's disciplinary hearing. Stevens did not have any involvement in the due process hearing, and Stevens does not recall being told the results of the hearing.  Elsinger received the following evidence during

the hearing:  Stevens' written statements in the conduct report; written testimony from Henderson and live testimony from Davis; letters; Nelson's urinalysis result; and Nelson's oral statement.  (Ex. 102 (dkt. #64-1) 3.)  Henderson was not allowed to appear in person, but he was able to complete written answers to a few of Nelson's written questions.  With respect to the substance of Henderson's and Davis's testimony, Henderson denied receiving cocaine from Nelson, and Henry Davis testified that he did not pass anything to Nelson.  In addition to his comments at the hearing, Nelson asked to submit a written statement in his defense, but Elsinger denied him that request.

Elsinger found Nelson guilty of all three charges in the conduct report.  Generally, Elsinger reasoned that:  (1) Stevens appeared credible; (2) Nelson's verbal testimony was inconsistent with the evidence; and (3) Nelson did not appear to take ownership of his actions because he continued to deny taking cocaine and complained that he was unable to make a written statement, even though he was allowed to speak in his defense during the hearing itself.  Elsinger also made the following specific findings:

> Nelson's testimony appears to attempt to mislead the hearing officers and appears untruthful.  [Inmate] Nelson stated he was not guilty of use even though he had completed a UA for GBCI staff, that came back positive for Cocaine.  [Inmate] Nelson was presented with th[e] Official Lab results and doesn't contest they are his but maintains he is not guilty even though the results were positive[.]
>
> …
>
> According to Investigator [Stevens,] [Inmate] Nelson was seen on surveillance footage with the package that was consistent [with] the cocaine found in [Inmate] Henderson's cell.  That is why I'm finding him guilty of 303.43 [Possession of intoxicants].
>
> …

15

> [Inmate] Nelson provided a sample that tested positive for Cocaine. Confirmation test results also came back positive for Cocaine. That is why I am finding him guilty of 303.60 [Use of intoxicants].

(*Id.* at 4.)

Ultimately, Elsinger concluded that 240 days of disciplinary separation was an appropriate disposition. He reasoned that the introduction of drugs into the prison setting is taken seriously because it carries the risk of increased anger, violence and disruptive behavior. Elsinger further reasoned that Nelson knew he was violating a rule and committing illegal activity in using cocaine, but he refused to admit it. Although Elsinger could have issued Nelson up to 360 days of disciplinary separation pursuant to Wis. Admin. Code § DOC 303.72, he declined to do so because a serious disruption did not actually occur. However, Elsinger did factor Nelson's having been previously involved in smuggling drugs into prison in 2005.

Nelson appealed Elsinger's disposition to the Warden Eckstein. Nelson's appeal complained that Elsinger denied him exculpatory evidence (the video footage) and would not allow him to submit a written statement. Eckstein received the appeal on August 14, 2017, along with the disciplinary record, including the conduct report, reasons for decision and evidence at the hearing. Although Eckstein agreed that there was evidence to support the guilty findings as to both Possession and Use of Intoxicants, he found Nelson could not also be guilty of Attempted Unauthorized Transfer of property, since it was a lesser included offense to the possession charge. Even so, Eckstein agreed that 240 days in disciplinary separation status was an appropriate disposition. Therefore, Eckstein affirmed Elsinger's disposition, other than remanding to correct the additional finding of guilt on

16

the Attempted Unauthorized Transfer of Property charge.  Warden Eckstein now attests that he had no reason to believe Elsinger was biased against Nelson on the ground that Elsinger had offered Nelson the 240-day disposition before the hearing.

After Eckstein sent the conduct report back for correction, Nelson was formally found guilty of Wis. Admin. Code §§ 303.43 and 303.60.  At that time, defendant Elsinger added, with respect to the Unauthorized Transfer of Property Charge, that "Rinn was attempting to send money to [Inmate] Nelson's relative for payment.  This is why I'm finding him guilty of 303.40(A)."  (Ex. 102 (dkt. #64-1) 7.)  However, Elsinger explains that he did not realize that the Unauthorized Transfer of Property charge was a lesser included offense of the Possession and Use of Intoxicants charge.  Regardless of the correction, Elsinger also explained that he still believed 240 days of disciplinary separation was an appropriate disposition.  The decision was mailed to Nelson on September 22, 2017.[9]

### E.  Phone Call Monitoring and Legal Mail Interference

Nelson claims that in October of 2017, defendants Heil and Stevens worked together, monitoring Nelson's phone calls and legal mail with his attorney, Jarrett Adams.  During the relevant period, prisoners in the RHU submitted a request to Social Worker Heil to make phone calls using the prisoner phone system.  Heil would then approve or

---

[9] Nelson includes numerous findings of fact related to his conditions of confinement in disciplinary separation.  These proposed findings of fact are not material to the parties' summary judgment motions because defendants concede that Nelson's confinement in disciplinary separation triggered a loss of liberty for purposes of establishing one of the elements of Nelson's due process claims.  As such, the court has omitted recitation of those proposed factual findings here.

deny those requests.  During the time period relevant to Nelson's claims, the DOC used Securus Technologies for the prisoner collect call phone system.  Securus automatically recorded all prisoner calls for monitoring, unless the phone number called is listed in the system as an attorney's number.  To have a confidential attorney call, prisoners are required to submit a DOC-1631 form with the prison, so that the attorney's number can be added to Securus's list of calls not to record.[10]

Green Bay staff are trained to not knowingly monitor or record a properly placed telephone call.  They are instructed that if, while monitoring or recording a call, it becomes apparent that the call is to an attorney, further monitoring/recording must cease.  If that happens, staff must also submit an incident report describing the circumstances resulting in the call being monitored.

Nelson alleged in his complaint that on or about October 24, 2017, Heil listened to Nelson's phone calls with Adams about this pending lawsuit.  (Compl. (dkt. #1) ¶ 62.)  Beyond that allegation in his complaint, Nelson has submitted no further details or evidence to provide context for his allegation.

Social Worker Heil specifically denies listening to any calls between Nelson and Attorney Adams.  Defendants' record of Nelson's calls shows that between August 1 and October 31 of 2017, Nelson placed six calls using the Securus, but none were to Adams.  The Securus system showed that five of the calls were to Jose Maruri, and one of the calls was to Billy Smith.  The system showed that only one call (the Jose Maruri call) was

---

[10] Attorneys may also contact the institution to schedule a phone call with a prisoner.  However, those calls are made through a different phone system from the prisoner collect call system.  Calls *from* attorneys were also not recorded by Securus.

listened to:  on October 21, 2017, former Green Bay correctional sergeant Michael Du Pont accessed the call.  Attorney Adams' current phone number never showed up as a call during the relevant time period.

During the 2017 investigation into Nelson's drug-related activities, Nelson's mail was also monitored for several months, so that Captain Stevens could determine whether Nelson was receiving mail from visitors he suspected were involved in bringing drugs into Green Bay.  Stevens also believed that the mail could contain evidence.  When a prisoner is on a mail monitor, the mailroom sends that prisoner's incoming and outgoing mail to security staff for review.  The staff screening the mail do not read any marked "attorney mail."

Nelson claims that he did not receive certain legal documents that his attorney had sent him, and prison staff acknowledged that his legal mail had been improperly opened. Defendants respond that it is likely that prison staff in the mailroom inadvertently opened his mail, including legal mail, but emphasize that there is no evidence suggesting that Captain Stevens opened the mail, read any of it or removed any items.  Stevens attests as much, adding that if he received properly marked legal mail, he would have delivered it. Social Worker Heil also attests that she did not open or review any of Nelson's incoming mail that had been properly labeled as coming from an attorney.

### F. Stevens' Investigation that Nelson Put a "Hit" on Green Bay Officials and Another Prisoner

In November 2017, a prisoner told Captain Stevens that he overhead a phone call of another prisoner, who said something indicating that Nelson had put a "hit" on Warden

Eckstein, Captain Swiekatowski, Stevens and another prisoner. That prisoner told Stevens that the phone call related to Nelson transferring money between prisoners so the hit could be carried out.

Due to the seriousness of this report, Stevens started an investigation. He interviewed several prisoners who might have information about the potential hit. One prisoner wrote Stevens a letter saying that Nelson had paid three people to have them assaulted. Another prisoner also told Stevens that Nelson had put a hit on a prisoner. Stevens concluded at the end of his investigation that the claim about the hit on the Green Bay officials lacked merit. As a result, the prisoner who wrote Stevens the letter making that claim was charged in a conduct report for Lying and Disruptive Conduct. Stevens' investigation was closed on December 12, 2017.

Nelson claims that Stevens fabricated the claims about the hits, and that Stevens told Henry Davis that Nelson put a hit out on him. Stevens disputes this. In any event, defendants argue that the dispute is not material, since Davis submitted a declaration stating that there is "no animosity" between him and Nelson, and that Stevens was "always falsely alleging that someone" had put a hit out on him." (*See* H. Davis Decl. (dkt. #22) ¶¶ 10-11, 16.) For his part, Stevens says that he was never told that Nelson put a hit out on Henry Davis, and he never told Davis that Nelson put a hit out on him. Rather, Stevens says he was told that Nelson put a hit out on a different prisoner, and he never told that prisoner a hit had been placed on him.

Stevens further attests that he does not recall being contacted about any inmate complaint or informal complaint Nelson was pursuing about a conduct report from earlier

in 2017. Nelson disputes this, claiming another prisoner, Raymond Jackson, heard Stevens threaten Nelson with administrative confinement if he did not drop his challenges to the conduct report.

### G. Nelson's Placement on Administrative Confinement Status

On October 19, 2018, almost a year later, Captain Van Lanen recommended Nelson for administrative confinement status. The documentation related to the recommendation does not reference Stevens' 2017 investigation into whether Nelson put out a hit on Green Bay officials and another prisoner. Rather, it was noted that Nelson, who was 41 years old, had received 17 minor and 12 major conduct reports since he entered prison at 22 years of age. The major conduct reports referenced in the recommendation were for:

- Soliciting an Employee and Disobeying Orders, dated 4/23/2018;

- Possession of Intoxicants and Use of Intoxicants, dated 7/31/2017;

- Sexual Conduct, dated 11/12/2016;

- Disobeying Orders and Unauthorized Forms of Communication, dated 8/17/2016;

- Lying and Possession/Manufacture/Alter Weapon, dated 11/11/2011;

- Possession of Intoxicants -- Attempt, dated 10/20/2005;

- Fighting, dated 1/13/2005;

- Use of Intoxicants, dated 4/30/2004; and

- Battery -- Aid/Abet, dated 9/20/2002.

The recommendation further noted "it is not the volume of the conduct reports that is of concern, but rather the serious nature of his conduct reports." (Ex. 107 (dkt. # 40-2) 6-7.)  Although the recommendation noted that Nelson had completed certain programming, it also observed that (1) he "continues to demonstrate the same criminal behaviors now as he did when he was a teenager," and (2) Nelson did not take responsibility for his actions.  (*Id.*)  As such, Van Lanen recommended Administrative Confinement because "Nelson's continuous history and well-established pattern of using, selling, and obtaining drugs poses a threat to the overall security and safety of both staff and inmates."  (*Id.*)  The Administrative Confinement Review Committee unanimously determined Nelson should be placed on administrative confinement.  The issue of the 2017 hit never came up at the hearing or in the decision.

## OPINION

Defendants seek judgment in their favor on all of Nelson's claims, and Nelson seeks judgment in his favor on his due process claims against Stevens and Elsinger.  Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  When the parties cross-move for summary judgment, the court looks to the burden of proof that each

party would bear on an issue at trial and requires that party to go beyond the pleadings to affirmatively establish a genuine issue of material fact.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).  If either party fails to establish the existence of an element essential to his or her case, and on which that party will bear the burden at trial, summary judgment against that party is appropriate.  *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

Here, Nelson has failed to establish that the evidence of record entitles him to relief on his due process claims against Stevens and Elsinger, and defendants have established that no reasonable trier of fact could find in Nelson's favor on his claims, even when construing the evidence in his favor.  Accordingly, Nelson's motion for partial summary judgment will be denied, and defendants' motion will be granted.

## I.      Fourteenth Amendment Due Process Claim

Nelson is proceeding with his Fourteenth Amendment claim that defendants Stevens, Elsinger and Eckstein denied him due process in different ways:  (1) defendant Stevens by preventing him from submitting video footage as evidence at the disciplinary hearing; (2) Elsinger by failing to act as a neutral hearing officer; and (3) Eckstein by failing to correct these due process violations on appeal.   The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  To prevail on a procedural due process claim under § 1983, a plaintiff must demonstrate that he:  (a) has

a cognizable interest; (b) has suffered a deprivation of that interest; and (c) was denied due process. *Kahn v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

Generally, a prisoner facing transfer to and confinement in segregation is "entitled to informal, nonadversarial due process." *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012) (citing *Wilkinson*, 545 U.S. at 211-12). "Informal due process requires only that the inmate be given an opportunity to present his views" to a neutral decisionmaker. *Id*. at 685 (internal quotation marks omitted). "If the prison chooses to hold hearings, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses." *Id*. (citations omitted). Finally, inmates are not entitled to a written decision but only to review by a neutral decisionmaker. *Id* at 686.

Defendants concede for purposes of summary judgment that Nelson's 240-day disciplinary separation disposition triggered a liberty interest, but contend that judgment in their favor is appropriate as a matter of law because no reasonable trier of fact could conclude that defendants Stevens, Elsinger or Eckstein denied plaintiff Nelson due process.

### A. Stevens

The parties have cross-moved for summary judgment on plaintiff's claim that Stevens' failure to preserve the video footage violated his due process rights. "Prisoners faced with a disciplinary proceeding have a right to the disclosure of material exculpatory information if they request it before or during the hearing." *Keller v. Watson*, 740 F. App'x 97 (Mem), 2018 WL 5046797, at *2 (7th Cir. Oct. 17, 2018) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-69, 94 S. Ct. 2963 (1974), and *Piggie v. McBride*, 277 F.3d 922, 925

24

(7th Cir. 2002) ("*Piggie I*").  Evidence is material if there is a reasonable probability of a different result.  *Toliver v. McCaughtry*, 539 F.3d 766, 780-81 (7th Cir. 2008).  Evidence is exculpatory if it undermines or contradicts the finding of guilt.  *Jones v. Cross*, 637 F.3d 841, 848 (7th Cir. 2011); *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007).

Prisoners do not necessarily have a right to review any exculpatory information, but they do have the right "to insure that the disciplinary board considers all of the evidence relevant to guilt or innocence and to enable the prisoner to present his or her best defense." *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (citing *Chavis v. Rowe*, 643 F.2d 1281 (7th Cir. 1981)); *see also Armstrong v. Daily*, 786 F.3d 529, 545, 550 (7th Cir. 2015) (suppression of material exculpatory evidence violates due process and the availability of post-deprivation remedies does not cure the problem); *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1072 (N.D. Ill. 2018) (same).  In circumstances in which a disciplinary board or officer excludes potentially exculpatory evidence, the institution has the burden to provide a legitimate reason for the denial, such as institutional security.  *Piggie I,* 277 F.3d at 925 (citing *Ponte v. Real*, 471 U.S. 491, 498-99 (1985)).  However, defendants' reason for denying plaintiff access to the video footage is *not* security-related.  Instead, plaintiff's request for the footage was denied because Stevens failed to save the footage and he could not save the zoomed footage.  This justification stands on shaky ground.  First, it begs the question:  why did Stevens not just store the footage in its original format for plaintiff and Elsinger to review at a zoomed level later?  Second, Stevens also does not explain why this was not an option, despite the fact that Nelson requested the video footage.  These questions loom even larger because Stevens *cited* to the video footage as

evidence he relied on in formulating the conduct report -- so at least at the time he wrote that report, Stevens believed it had to be material.

Defendants' alternative argument that plaintiff was undoubtedly involved in distributing drugs at Green Bay with or without the video evidence relies solely on information collected during the 2017 investigation, but all of this information was redacted from Exhibit 101.  (*See* Def. Br. (dkt. #59) 11.)  Plaintiff understandably objects to this argument because neither he nor his counsel was allowed to review the evidence that defendants now claim establishes plaintiff's involvement in drug activity.  Moreover, Nelson disputes that he was using cocaine or bringing it into Green Bay, meaning disputed issues of fact preclude entry of summary judgment in defendants favor on this claim for that reason.

Still, defendants may be entitled to summary judgment in their favor on this claim if plaintiff failed to submit evidence suggesting that the video footage *would* have changed the outcome of the disciplinary hearing.  In the context of a disciplinary decision, all that due process requires is that a guilty finding is based on "some evidence," which is unquestionably a very low threshold.  *Jones*, 637 F.3d at 845.  Indeed, in addressing due process claims related to the omission of evidence, the "harmless error analysis applies to prison disciplinary proceedings."  *Piggie*, 344 F.3d at 678 (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)); *see also Martin v. Zatecky*, 749 F. App'x 463, 466 (7th Cir. 2019) (prisoner "does not have a right to call witnesses who would give irrelevant, repetitive, or unnecessary testimony").[11]

---

[11] Although the Seventh Circuit decided *Piggie* and *Jones* in the context of habeas petitions, it has

Here, plaintiff claims the video footage would have disproved just one of Stevens' allegations:  that he passed cocaine to Henry Davis after his visit with Felicia Davis on July 9.  Specifically, plaintiff claims that the footage would have confirmed his story:  he was working as a runner between 11:30 a.m. and 2:30 p.m. on July 9, and Henry Davis did not leave his cell until after 2:00 p.m. that day.  To be fair, since Elsinger also cited explicitly to Stevens' reliance on the video footage, there is reason to believe plaintiff could have mounted a better defense to the possession charge if given access to the video footage. Still, plaintiff has not submitted evidence suggesting that the video footage could have caused Elsinger to find him *not* guilty of using intoxicants nor of attempting the unauthorized transfer of property charges.  *See Jeffries v. Neal*, 737 F. App'x 791, 793 (Mem) (7th Cir. 2018) (finding that the evidence petitioner sought to introduce during disciplinary hearing contained nothing to contradict the hearing officer's conclusion that he trafficked drugs) (citing *Jones*, 637 F.3d at 847-48; *Piggie*, 344 F.3d at 678-79); *Keller*, 740 F. App'x 97 (Mem), 2018 WL 5046797, at *2.

To the contrary, plaintiff chose to ignore this argument in his opposition brief, and even if he had addressed it, the record does not support a reasonable inference that the video would have increased his chances of being found not guilty of the charged violations.

---

since applied this same principle to due process claims brought under 42 U.S.C. § 1983.  *See Oliver v. Pfister*, 655 F. App'x 497, (7th Cir. 2016) (affirming dismissal of due process claim in which plaintiff's request for the appearance of the reporting officer was denied because plaintiff did not dispute the officer's allegations in the conduct report, meaning that the officer's testimony would not have aided in his defense); *Jackson v. Everett*, No. 06-2809, 2007 WL 1224609, at * (7th Cir. Apr. 24, 2007) (unpublished) (policy prohibiting inmate from calling witnesses did not amount to a due process violation because plaintiff had not articulated how he was prevented from admitting relevant evidence).

In the conduct report, Stevens cited multiple other pieces of evidence wholly unrelated to any possible video footage that supported the findings of guilt:  the money exchange between Rinn and Maruri a few days after she visited the plaintiff; Rinn's positive urinalysis; the inconsistent stories about why Rinn sent Maruri's $3,000; and plaintiff's positive urinalysis.  With respect to the use of intoxicants charge in particular, Elsinger was persuaded of plaintiff's guilt by his positive test for cocaine, which by itself meant he was subject to up to 360 days of disciplinary separation.  *See* Wis. Admin. Code § DOC 303.72. Further, although Elsinger noted the video footage in justifying his other guilty finding for the possession of intoxicants, he also reasoned that the communications between Rinn and Maruri supported a guilty finding with respect to the charge of attempting an unauthorized transfer of property.  Even assuming that the video footage had been presented *and* shown that Nelson did not actually pass Henry Davis the package at that time, plaintiff's punishment would likely have been the same.  Indeed, even if Elsinger would have found Nelson *not* guilty on the possession charge, he would still have found Nelson guilty on the *attempt* at unauthorized transfer of property charge, since the only reason Elsinger subsequently found Nelson not guilty of that charge is because it was deemed to be a lesser included offense of the possession charge.

In the end, plaintiff has made no effort to explain how Elsinger's conclusions would, or even should, have changed in the face of this other evidence, all of which justified his conclusion that it was more likely than not that Nelson was guilty of the attempt at unauthorized transfer of property *and* use of intoxicants charges.   Accordingly, no reasonable trier of fact could conclude that the video footage would have impacted the

outcome of the disciplinary hearing, and the court must grant defendant Stevens' motion for summary judgment with respect to plaintiff's due process claim.

### B. Elsinger

The parties have also cross-moved for judgment in their favor on plaintiff's due process claim that Elsinger was a biased hearing officer.  As an initial matter, conduct report hearing officers are entitled to a presumption of neutrality, so the constitutional standard for impermissible bias is high.  *Westefer*, 682 F.3d at 685 (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986); *Martin*, 749 F. at 466 ("We presume the honesty and integrity of adjudicators, and the burden for proving impermissible behavior is high.").  Even so, due process forbids an officer substantially involved in the factual events underlying disciplinary charges, or the investigation of such charges, from adjudicating those same charges.  *Piggie*, 344 F.3d at 666 (citing *Whitford v. Boglino*, 63 F.3d 527, 534 (7th Cir. 1995)).

Elsinger was obviously not involved in investigating Nelson or drafting the conduct report, and plaintiff has not directed the court to any authority suggesting that an officer who makes an uncontested offer is automatically disqualified to serve as a hearing officer. Furthermore, as defendants point out, in making plaintiff that offer on July 20, 2017, Elsinger was acting more like a prosecutor offering a criminal defendant a plea deal, rather than collecting any further evidence to support the charges in the conduct report during their interaction.

Still, plaintiff claims that Elsinger revealed a bias against him during their interaction by telling him that he would impose that same punishment even after conducting the hearing. (Compl. (dkt. #1) ¶ 43.) In particular, plaintiff characterized Elsinger as showing frustration with him for declining his proposed, prehearing disposition, but the statement alone was not particularly inflammatory and did not imply that Elsinger was angry with Nelson or even disliked him. Most importantly, although this statement suggests that Elsinger believed Nelson deserved the 240-day disposition if found guilty, his statement does not suggest that Elsinger actually predetermined his guilt or would refuse to weigh the evidence during the hearing. If anything, it could be interpreted as a statement by Elsinger that he would not impose a *harsher* punishment, up to the maximum of 360 days, should plaintiff insist on exercising his right to an evidentiary hearing.

Beyond this one alleged interaction, and his speculation about Elsinger's motives, plaintiff has submitted no additional evidence to rebut the presumption that Elsinger was unbiased. Certainly, the record of how Elsinger carried out the hearing does not advance plaintiff's position. Elsinger received evidence from Henderson, Henry Davis and plaintiff, and there is no evidence that Elsinger said or did anything during the hearing suggesting that he held a bias against plaintiff. While he would take issue with Elsinger's refusal to allow him to make a written statement, there is also no dispute that plaintiff was allowed to present his views orally in accordance with policy. Similarly, plaintiff's complaint that Henderson was not allowed to testify in person ignores that Elsinger gave Henderson the opportunity to answer written questions. Finally, while plaintiff would take issue with *how* Elsinger weighed the evidence and came to conclusions about Stevens' and Nelson's

credibility, an adverse ruling and the decision to impose the same sentence as previously offered is *not* evidence that Elsinger was biased against him.

In fact, as noted, Elsinger's decision to impose the same disposition as he offered before the hearing could easily demonstrate leniency, since he had discretion to impose a more severe disposition, up to 360 days.  Regardless, other than one statement, plaintiff has come forward with *no* evidence calling into question Elsinger's neutrality.  Although the court construes the evidence in a light most favorable to plaintiff, this treatment does not extend to inferences supported merely by speculation or conjecture, especially when a presumption of neutrality applies.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019); *see also Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (speculation or conjecture insufficient to raise issue of material fact).  Absent *any* case law that even calls into question the practice of a hearing officer proposing an agreed upon disposition before proceeding with a hearing, the court is unable to find a violation of plaintiff's due process rights.  Accordingly, the court will also grant defendant Elsinger's motion for summary judgment.


## C. Eckstein

At screening, the court construed plaintiff's due process claim against Warden Eckstein broadly, allowing him to proceed on the theory that Eckstein failed to intervene to correct due process deficiencies that occurred during the disciplinary hearing.  However, plaintiff has not come forward with evidence suggesting that Eckstein had reason to believe

that he lacked the opportunity to mount a defense to the charges in the conduct report, nor that Elsinger was biased against him.

In plaintiff's challenge, he complained only that Elsinger would not allow him to submit a written statement in his defense, and that Stevens prevented him from submitting the video footage referenced in the conduct report.  However, plaintiff failed to raise any concern about Elsinger's possible bias against him with Eckstein, *and* he did not articulate exactly how the video footage would have cleared him of the charges in the conduct report.

Most problematic, as previously noted, plaintiff did not point to any procedural defects related to the substantial evidence Elsinger had before him in finding plaintiff guilty:  Stevens' allegations; plaintiff's inconsistent answers to questioning about why Rinn was paying Maruri; plaintiff's positive cocaine urinalysis; and his refusal to take responsibility for that result.  Since no reasonable trier of fact could conclude that Eckstein had reason to believe that plaintiff's due process rights were violated during the disciplinary hearing, therefore, any failure to intervene on his behalf after the hearing falls short of proof of a denial of due process.


## II.    First Amendment Retaliation Claims

Plaintiff also alleges two retaliation claims against defendant Stevens for exercising his First Amendment rights.  First, he claims Stevens issued Conduct Report 2843714 because plaintiff refused to speak with Stevens about his investigation.  Second, plaintiff claims that Stevens falsely claimed that he put a hit out on Green Bay officials and another

inmate (Davis) to retaliate against him for refusing to speak with him and for complaining about the conduct report.

To state a prima facie case for retaliation under § 1983, plaintiff must produce sufficient evidence for a reasonable jury to conclude that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  Once a plaintiff produces evidence showing each of those elements, the burden shifts to the defendant to show "that the harm would have occurred anyway -- that is, even if there had not been a violation of the First Amendment -- and thus that the violation had not been a 'but for' cause of the harm, for which he is seeking redress." *See Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011).  In other words, an otherwise meritorious retaliation claim fails if a defendant's actions were supported by a legitimate reason.  *Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015) (citing *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (en banc); *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).  Defendants seek judgment on both of plaintiff's retaliation claims, albeit on different grounds.

### A.  Retaliatory Conduct Report

Defendants cite three reasons why judgment in their favor is appropriate as to plaintiff's claim that Stevens issued him Conduct Report 2843714 in retaliation for his

declining to speak about the drug investigation:  (1) no evidence supports a reasonable inference that Stevens issued the conduct report to punish him for not cooperating; (2) plaintiff's refusal to speak was not constitutionally protected conduct; and (3) the conduct report was supported by other, legitimate reasons even assuming Stevens had a retaliatory motive.  The court addresses each in turn.

### 1. Retaliatory Motive

Defendants assert that no evidence of record supports a reasonable inference that Stevens had a retaliatory motive in issuing Conduct Report 2843714.  "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of -- in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005).  Plaintiff's evidence of Stevens' retaliatory motive is Howard Brown's and his assertions that plaintiff told Stevens he would not discuss why Rinn was sending out money, and Stevens responded that he would teach plaintiff a lesson when he went for his urinalysis and would show him what "true power" meant.  (Brown Decl. (dkt. #13) ¶¶ 4-6.)  Of course, defendant Stevens denies making these statements.

If true, these statements are not direct evidence that Stevens issued the conduct report to punish plaintiff for declining to talk to him.  Yet Stevens' statement, which came immediately after plaintiff refused to talk to him, suggests that Stevens was going to take some sort of adverse action against him.  Given that Stevens immediately required plaintiff to submit to a urinalysis and within days charged him in Conduct Report 2843714, that

may be enough for a reasonable fact finder to infer that Nelson's refusal to talk to him was at least part of Stevens' motivation in writing him up.  As such, the court cannot conclude as a matter of law that Stevens did not have Nelson's resistance to questioning in mind when he wrote Conduct Report 2843714.

### 2.  Protected Conduct

In contrast, both of defendants' two remaining arguments succeed on this record. As to whether Nelson was engaging in constitutionally protected activity in declining to speak to Nelson, defendants point out that the Seventh Circuit has not decided whether a prisoner has a constitutional right to refuse to act as a prison informant.  *See Pearson v. Welborn*, 471 F.3d 732, 740 (7th Cir. 2013) (affirming verdict on other grounds, commenting "[r]egardless whether Pearson's refusal to act as an informant is constitutionally protected").  The Ninth and Fifth Circuit Courts of Appeals have suggested that there is no First Amendment right "not to snitch."  *United States v. Acosta*, 114 F.3d 928, 930 (9th Cir. 1997); *Lando v. Lamartiniere*, 515 F. App'x 257, at *1 (5th Cir. 2013) (prisoner did not identify constitutional right to refuse to inform); *Thomas v. Thomas*, 46 F. App'x 732 (5th Cir. 2002).  A number of lower courts have followed this same line of reasoning.  *See e.g., Knox v. Wainscott*, No. 03 C 1429, 2003 WL 21148973, at *8 (N.D. Ill. May 14, 2003) (prisoner failed to state a retaliation claim related to suspected involvement in, and refusal to cooperate in the investigation of, a loss or theft of an officer's keys); *Erwin v. Marberry*, No. 04-CV-72620, 2007 WL 4098201, at *5 (E.D. Mich. Nov. 16, 2007) ("[A] prisoner's refusal to serve as an informant is not constitutionally protected

conduct, and therefore cannot be used as a basis to substantiate a retaliation claim."); *Canosa v. State of Hawaii*, No. 05-00791 HG-LEK, 2007 WL 128849, at *2, 6, 10 (Jan. 11, 2007) ("The act of refusing to provide information about fellow inmates is not 'protected conduct' under the First Amendment."), *report and recommendation adopted by* 2007 WL 473679 (D. Haw. Feb. 8, 2007).

That said, in 2018, the Second Circuit concluded that a prisoner has a right not to snitch, due to the safety risks involved. *Burns v. Martuscello*, 890 F.3d 77, 81, 91 (2d Cir. 2018) (applying the balancing test set forth in *Turner v. Safely*, 482 U.S. 78, 89-91 (1987), and concluding that "forcing an inmate to serve as an informant on an ongoing basis is not reasonably related to a legitimate penological purpose -- namely, safety"). And certain district courts have held that a prisoner has a right not to participate in prison investigations or to act as an informant. *David v. Hill*, 401 F. Supp. 2d 749 (S.D. Tex. 2005) (right not to participate in investigation); *Jackson v. Johnson*, 15 F. Supp. 2d 341, 364 (S.D.N.Y. 1998) (assumes without deciding that prisoners have a constitutional right not to be an informant).

Neither party has cited any authority suggesting how the Seventh Circuit might ultimately come down on this question. As importantly, plaintiff does not respond to this argument at all, constituting waiver. *See Wojitas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) ("failure to offer any opposition to [an argument] constituted a waiver").[12]

_____

[12]  While plaintiff's decision not to talk to Stevens could be construed as a decision not to be an informant, but also a decision to protect himself from incrimination, he did not seek to proceed on a separate Fifth Amendment claim related to his right against self-incrimination, nor has he

In any event, defendants also assert that Stevens is entitled to qualified immunity from monetary damages.[13]   "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).   The inquiry is two-fold:  "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).  Once a defendant asserts a qualified-immunity defense, it is the plaintiff's burden to establish that the defendant's action violated a clearly established right.  *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010).

The law related to whether the refusal to participate in an investigation was not clear in the Seventh Circuit when Stevens issued the conduct report in 2017, nor is it clear now.  As such, even assuming Stevens' retaliated against plaintiff for refusing to answer his questions about how drugs were getting into Green Bay, he was not violating clearly established law in doing so.  Indeed, plaintiff failed to respond to defendants' argument on the merits, nor has he directed the court to any authority indicating that he had a clearly

---

developed any facts related to whether Stevens was attempting to elicit incriminating statements from him.  As such, the court has not construed his decision not to speak to Nelson as the exercise of his Fifth Amendment right to avoid self-incrimination.

[13]   Although defendants are entitled to qualified immunity, given that Nelson is seeking both injunctive relief and monetary damages, the court has addressed defendants' merits-based arguments as well.

established right not to speak to Stevens.  Accordingly, defendants' motion for summary judgment as to Nelson's retaliation claim against Stevens for issuing Conduct Report 2843714 will be granted.

### 3.  Legitimate Reasons for the Conduct Report

Finally, judgment in defendants favor is also appropriate because Stevens had sufficient, objective information to charge plaintiff with unauthorized transfer of property, as well as possession and use of intoxicants.  In particular, three other prisoners had informed Stevens that Nelson was the "main person" bringing drugs into Green Bay; Stevens had reviewed correspondence from other prisoners suggesting that plaintiff's visitors were involved in bringing in drugs; Rinn transferred money to Maruri, who visited plaintiff shortly afterwards and around the time a large amount of cocaine was found; Stevens received inconsistent reasons for why Rinn was transferring money; and Rinn and plaintiff both tested positive for cocaine.  Although plaintiff insists that he was innocent of the charges, it remains undisputed that Stevens considered this information when he wrote the conduct report.  Accordingly, no reasonable trier of fact could conclude that Stevens would not have issued the conduct report even if plaintiff had decided to speak to him.

### B.  Stevens' Allegedly False Claim about Hits

Defendants similarly seek judgment on the retaliation claim against Stevens related to his investigation into whether plaintiff put a hit out on multiple Green Bay officials and

another prisoner.  The court allowed plaintiff to proceed on this claim because he alleged that Stevens' investigation ensured he would be recommended for Administrative Confinement status, and that Stevens started the investigation to punish plaintiff for complaining about Conduct Report 2843714.  Defendants seek judgment since the evidence of record does not support a reasonable finding that Stevens' investigation was sufficiently adverse to deter a prisoner of ordinary firmness from challenging a conduct report again in the future.  On this more developed record, the court now agrees.

To start, no evidence of record suggests that Stevens' investigation into the alleged hits adversely impacted plaintiff by ensuring his Administrative Confinement placement. Indeed, Stevens closed the investigation on December 12, 2017, and did not issue plaintiff a further conduct report or punish him in any other manner.  To the contrary, Stevens issued a conduct report to the prisoner who accused plaintiff of putting the hits out.  That was the only lasting impact of Stevens' investigation.

In addition, Captain Van Lanen did *not* recommend plaintiff for Administrative Confinement status until October 19, 2018, almost a year after Stevens' investigation ended.  Critically, Van Lanen also did not even mention the investigation as one of the bases for recommending plaintiff's placement on Administrative Confinement status. Instead, Van Lanen relied on his conduct report history, as well as his impression that plaintiff's "well-established pattern" of drug use, possession, and sales within the prison posed a threat to institutional safety and security.  Likewise, the record contains no indication that, in agreeing with Van Lanen's recommendation, the Administrative Confinement Review Committee relied on, or even *knew* of Stevens investigating whether

39

plaintiff put a hit out on Green Bay officials and another official.  Plaintiff has also not cited to any other adverse impact of Stevens' investigation into the hits.  As such, no reasonable fact finder could conclude that Stevens' investigation adversely impacted plaintiff in a manner that would deter a prisoner of reasonable firmness from challenging the outcome of a conduct report again.

Finally, defendants contend that Stevens' investigation into plaintiff's alleged hits was supported by a legitimate safety concern.  Plaintiff maintains that he never actually ordered a hit on any Green Bay officials or another prisoner, and that Stevens fabricated the alleged hits to continue his campaign of harassment against him, but plaintiff has not come forward with any evidence suggesting that Stevens actually fabricated the reports from the confidential informants.  While this is understandable given that neither he nor his counsel were allowed to review the investigatory materials that have been submitted under seal, the court need not reconsider the decision to keep those records confidential since plaintiff was unable to submit evidence that could persuade a reasonable trier of fact that he suffered an adverse consequence from Stevens' investigation.   Accordingly, defendant Stevens is entitled to summary judgment in his favor on this retaliation claim as well.


IV.     **First Amendment Monitoring Claim**

Defendants next seek summary judgment on plaintiff's First Amendment claim related to defendant Heil's alleged monitoring of a telephone call between attorney Adams and himself, which then caused Stevens to intercept Nelson's legal mail from Adams.  Mail

interference claims involving legal communications involve more robust constitutional protections, since such claims may involve a prisoner's ability to access the courts. *Kaufman v. McCaughtry*, 419 F.3d 678, 685-86 (7th Cir. 2005); *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citing *Lewis v. Casey*, 518 U.S. 343 (1996)).  In particular, the Court of Appeals for the Seventh Circuit has held that delayed or opened legal mail can state a claim under the First Amendment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1431-32 (7th Cir. 1996) (prisoner's allegations that legal mail was opened, delayed for an inordinate period of time, and sometimes stolen, stated a First Amendment claim).

Defendants seek judgment on this claim because no evidence of record suggests that defendants Heil or Stevens actually listened to any phone calls between plaintiff and his attorney, and that Stevens never actually read his legal mail or removed any items from the mail he received from Adams.  As to the phone monitoring, defendants cite undisputed evidence that Heil did not listen into any phone call between plaintiff and Adams.  In particular, they point out that although plaintiff claims that Heil listened to his phone calls with Adams around October 24, 2017, there is *no* record that plaintiff even placed a call to Adams' phone number during that time frame.  In fact, it is undisputed that between August 1 and October 31, 2017, Nelson placed six calls, and *none* were to Adams' phone call.  Rather, five calls were with Jose Maruri, and one was with a number belonging to a person named "Billy Smith."  Moreover, the Securus system shows that the only monitored call was done by another Green Bay employee, rather than Heil.  Accordingly, plaintiff has failed to come forward on summary judgment with any evidence to the contrary, nor has he explained how he would have personal knowledge that Heil listened to a conversation

41

he had with Adams, making it unreasonable to infer that Heil was involved in the events leading Stevens to intercept plaintiff's legal mail.

As for Stevens' alleged review of legal mail, plaintiff claims that his legal mail had been opened when he received it. Defendants do not dispute that allegation, but argue that it makes sense that plaintiff's legal mail would be open because he was on a mail monitor. As defendants point out, plaintiff has not come forward with any evidence suggesting that Stevens actually *read* his legal mail or removed any items from it. As such, it would be unreasonable to infer that Stevens interfered with plaintiff's communications with Adams in any discernable way, and the court will grant defendants' motion for judgment on plaintiff's claims challenging defendants' phone and mail monitoring.

## V.   Eighth Amendment Deliberate Indifference

Finally, defendants seek judgment on plaintiff's Eighth Amendment claim against Stevens because it would be unreasonable to infer that his investigation created a risk of assault by another prisoner. The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates" and "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (internal citations omitted). *See also Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). The Court of Appeals for the Seventh Circuit and this court have both held in the past that prison officials violate inmates' Eighth Amendment rights by maliciously encouraging other prisoners to harm them, even if they are not actually harmed physically; *see, e.g., Turner v. Pollard*, 564 Fed. Appx. 234, 239 (7th Cir. 2014) ("[G]iven the substantial danger

42

to which Swiekatowski allegedly exposed Turner, Turner may be eligible for nominal or punitive damages."); *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) ("Prison officials who recklessly expose a prisoner to a substantial risk of a serious physical injury violate his Eighth Amendment rights."); *Jenkins v. Freeman*, 2010 WL 2812959, *1 (W.D. Wis. 2010) (citing *Irving v. Dormire*, 519 F.3d 441, 449 (8th Cir. 2008) (guard's attempt to induce other prisoners to assault plaintiff may violate Eighth Amendment, even if prisoner was not assaulted).

In screening plaintiff's complaint, however, the court expressed skepticism about his claim that Stevens subjected him to a substantial risk that Henry Davis might harm him because Stevens falsely accused plaintiff of putting a hit out on Green Bay officials and Henry Davis.  In particular, it seemed unreasonable that Henry Davis might harm plaintiff given that:  Davis submitted a declaration in support of his claims in this lawsuit; Davis attested in that declaration that he did not actually believe Stevens; *and* Davis stated there was "no animosity" between plaintiff and him.  (1/22/2019 Order (dkt. #30) 21-22.) 16.)  Still, the court allowed plaintiff to proceed past screening, since to find otherwise would require the court to resolve an ambiguity in Stevens' favor.

Despite the opportunity to develop the facts related to this claim, plaintiff has been unable to come forward with any supporting evidence confirming that plaintiff was at actual risk of harm as a result of Stevens' investigation into the alleged hits.  For example, plaintiff has submitted no evidence related to whether Henry Davis actually believed that he put a hit out on him, or whether Henry Davis actually threatened him with harm after hearing about the alleged hit.  Nor has plaintiff submitted evidence that any other prisoner

43

at Green Bay learned about the false hits, much less whether anyone else sought to harm plaintiff as a result.   Given that Stevens attests that he told no prisoners about his investigation into the ultimately debunked claim that plaintiff had put out various hits, it would be unreasonable to infer that Stevens' investigation created a substantial risk of serious harm.   For that reason, defendants are entitled to judgment on this claim as well.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #58) is GRANTED.

2) Plaintiff Antoine Nelson's motion for partial summary judgment (dkt. #73) is DENIED.

3) Plaintiff's motion to strike (dkt. #83) is DENIED AS MOOT.

4) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 4th day of May, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge